# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action Number |
| | ) | 06-00333-01-CR-W-DW |
| Bent O. Trower, | ) | |
| | ) | |
| Defendant. | ) | |

## Report and Recommendation

Pending before the Court is the MOTION TO SUPPRESS EVIDENCE filed December 12, 2006 (Doc. #22) by defendant Brent O. Trower ("Trower"). On January 31, 2007, the undersigned held an evidentiary hearing on Trower's motion. Trower was present and was represented by his counsel, Ronna Holloman-Hughes. The government was represented at the hearing by Assistant United States Attorney Christine Tabor. At the evidentiary hearing, the government called two witnesses, to wit: Clint Griswold and Seth Rorebeck. Additionally, eleven exhibits were admitted into evidence: the search warrant [Govt. #7], and photographs of the interior of Trower's resident [Govt. #1-5, Deft. #1-3, 5, 7]. On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

### PROPOSED FINDINGS OF FACT

1. On September 14, 2006, Clint Griswold was employed as a deputy sheriff with the Grundy County Sheriff's office. Tr. at 4, 5.

2. On that date, Deputy Griswold received a telephone call from Trower. Tr. at 5.

3. Trower reported that his fiancee, April Aguilar, was missing. Tr. at 5.

4. According to Trower, Ms. Aguilar had only recently moved to the United States and was in the country on a 90-day marital visa. Tr. at 6, 7.

5. Deputy Griswold instructed Trower (who resided in Trenton, Missouri) to file a missing person's report with the Trenton Police Department. Tr. at 6.

6. Subsequently, Trower called Deputy Griswold again and told him that he believed Ms. Aguilar might be found at the residence of Vernon and Nandit Jones near Spickard, Missouri, in Grundy County. Tr. at 6-7.

7. According to Trower, a few days after Ms. Aguilar arrived in the United States, she met Mr. and Mrs. Jones at a grocery store in Trenton. Tr. at 7.

8. Like Ms. Aguilar, Nandit Jones was Filipino. Tr. at 7.

9. Trower stated that he believed Mr. and Mrs. Jones had visited Ms. Aguilar at Trower's home earlier that day (just prior to Ms. Aguilar's disappearance). Tr. at 8.

10. Eventually, Deputy Griswold spoke with Vernon Jones on the telephone. Tr. at 9.

11. Vernon Jones asked Deputy Griswold to come to his residence because he did not wish to speak on the telephone, although he did state that Ms. Aguilar was unhappy in the United States and was asking about ways to return to the Philippines. Tr. at 9, 10.

12. Later that day, Deputy Griswold went to the Jones' residence. Tr. at 13.

13. The Joneses informed Deputy Griswold that Ms. Aguilar left because she was afraid of Trower because he had drugs and a pistol in his house. Tr. at 13.

14 According to the Joneses, earlier that day, Ms. Aguilar had shown them marijuana in Trower's residence – in the freezer and underneath a recliner in the living room. Tr. at 13-14.

15 With the consent of the Joneses, Deputy Griswold searched the Jones' house and determined that Ms. Aguilar was not hiding there. Tr. at 15.

16. Deputy Griswold then contacted Deputy Jimmy See in the Grundy County Sheriff's Department and Officer Seth Rorebeck of the Trenton Police Department and told them that there was allegedly marijuana and guns at Trower's residence (including marijuana under a recliner in the living room). Tr. at 15-16, 46.

17. When Deputy Griswold contacted Officer Rorebeck he was already at Trower's residence (Trower had also contacted him on the telephone). Tr. at 16, 42.

2

18. Officer Rorebeck had arrived at Trower's residence at approximately 7:54 p.m. Tr. at 43.

19. Trower invited Officer Rorebeck into the house to talk. Tr. at 44.

20. Trower also showed Officer Rorebeck a picture of Ms. Aguilar and some of the clothes and gifts that she had left behind in a back bedroom. Tr. at 44-45.

21. At approximately 9:10 p.m., Deputy Griswold and Deputy See arrived at Trower's residence. Tr. at 16.

22. When Deputy Griswold arrived at the Trower residence, Trower was sitting on the front porch steps with Officer Rorebeck having a conversation. Tr. at 17, 47.

23. Deputy Griswold told Trower that Ms. Aguilar was not at the Jones' residence and asked if Trower had any additional information. Tr. at 17.

24. Trower stated that he had arrived home from work earlier that day and found a note from Ms. Aguilar, which Trower had lost. Tr. at 17-18, 49.

25. Deputy Griswold asked Trower if they could go inside and look for the note. Tr. at 18, 49.

26. Trower agreed that the three officers could come into the house and they all went into the living room. Tr. at 18, 49.

27. Trower then led Deputy Griswold through the kitchen and a back bedroom and showed him various gifts and possessions that Ms. Aguilar had left behind. Tr. at 19-23.

28. While Trower was taking Deputy Griswold to the back bedroom, Officer Rorebeck bent down and, from about four feet away, glanced under the recliner in the living room with his flashlight and saw a "white paper plate with a green leafy substance that appeared to be marijuana and rolling papers." Tr. at 49-50, 58.

29. After being led through the house, Deputy Griswold asked if Trower would agree to allow officers to look "around the residence for any evidence of commission of a crime or any notes that [Ms. Aguilar] might have left." Tr. at 23.

30. At that point, Trower refused to allow such a search. Tr. at 23.

31. Officer Rorebeck then asked to speak to Deputy Griswold outside of the house. Tr. at 24-25.

32. Once outside, Officer Rorebeck stated that he did not think that Trower was going to consent to any further search of the house and that Officer Rorebeck had seen a paper plate of marijuana underneath a recliner in the living room. Tr. at 24.

33. Thereafter, Deputy Griswold placed Trower under arrest for the marijuana that was observed by Officer Rorebeck underneath the recliner in his living room. Tr. at 25-26.

34. Subsequently, Deputy Griswold obtained a search warrant for the Trower residence and recovered, among other things, marijuana. Tr. at 26-27.

## PROPOSED CONCLUSIONS OF LAW

The Fourth Amendment to the United States Constitution guarantees the right "to be secure in [our] persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend IV. The touchstone of the Fourth Amendment's promise is "reasonableness," which generally – though not always – translates into a warrant requirement. *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652, 115 S.Ct. 2386, 2390-91 (1995). One well-settled exception to the warrant requirement is the "plain view" doctrine. The plain-view doctrine permits law enforcement officers to seize evidence without a warrant if:

> (1) 'the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed,'
>
> (2) the object's incriminating character is immediately apparent, and
>
> (3) the officer has a 'lawful right of access to the object itself.'

*United States v. Hughes*, 940 F.2d 1125, 1126-27 (8th Cir.) (1991) (*quoting*, *in part*, *Horton v. California*, 496 U.S. 128, 136-37, 110 S.Ct. 2301, 2307-08 (1990)).

4

In this case, the Court concludes that the plain view doctrine constitutionally justifies the discovery of the marijuana by Officer Rorebeck. Inasmuch as the incriminating nature of the marijuana plate was readily apparent, the critical issue is whether Officer Rorebeck was "'in a place where the officer ha[d] a right to be.'" *United States v. Criswell*, 696 F.2d 636, 640 (8th Cir.1983) (*quoting Washington v. Chrisman*, 455 U.S. 1, 5, 102 S.Ct. 812, 816 (1982)). Under the facts presented, the Court finds that Officer Rorebeck (and the other two law enforcement officers were voluntarily) invited by Trower into his house, in part, for the purpose of locating the letter left by Ms. Aguilar. At no time prior to the plain view discovery of the marijuana did Trower make any effort to limit the scope of his consent. As such, Officer Rorebeck had a right to be in the Trower living room and to look under the chair (where the letter could have been lying). *Compare United States v. Johnson*, 707 F.2d 317, 322 (8th Cir. 1983) ("[The defendant] seems to be arguing that the firearms were not in 'plain view' because they were hidden in and under the bed, and were not openly visible when the officers entered the room. However, the firearms can still fall within the plain view doctrine because they were discovered in a place where the officer ha[d] a right to be.")

The Court further concludes that the application of the plain view doctrine is permissible even though the law enforcement officers sought Trower's permission to enter his residence with some belief that they would find marijuana under the recliner in the living room. In *United States v Wright*, 641 F.2d 602 (8th Cir. 1981), the Eighth Circuit found that some "minimal deception" by law enforcement officers is acceptable. In *Wright*, undercover agents, during the course of their drug investigation, knocked on the defendant's motel door, pretending to have car trouble, asking to borrow some tools, and saw a white powdery substance and drug paraphernalia

5

in plain view within the motel room. After employing the ruse, the agents obtained a search warrant, which was executed that night, and which yielded a shotgun, quantities of powdery substances, some pills, a cutting mirror and other drug paraphernalia, and a small notebook listing various drugs, their quantities, and prices. The court found that the undercover officers, by standing in the open door of the motel unit, like any member of the public, could see inside and observe various items in plain view. Although the undercover officers did not reveal their true identity or true purpose, and to that extent did lie, the *Wright* court said that it recognized the necessity for some kinds of undercover police activity; the officers did not engage in any conduct inconsistent with that expected or contemplated by the defendant when he opened the door. The fact that the officers approached the defendant with a lawful purpose, namely "fixing" their car, rather than an unlawful one, such as buying drugs, did not make their ruse unacceptable. Similarly, in this case, the officers' legitimate efforts in investigating the disappearance of Ms. Aguilar does not invalidate the plain view doctrine.[1]

Finally, the mere fact that Officer Rorebeck observed the marijuana under the chair with the assistance of his flashlight does not alter this conclusion. The plurality opinion in *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535 (1983), is instructive on this point. In *Brown*, in sustaining a warrantless seizure under the plain view doctrine, a plurality of the Court concluded that the police officer's use of a flashlight to illuminate the interior of respondent's automobile at a routine license checkpoint did not violate the respondent's Fourth Amendment rights:

---

[1] In this case, the "deception" is far less substantial than in *Wright*. Trower knew that he was allowing three law enforcement officers into his residence.

> It is . . . beyond dispute that . . . [the officer's] action in shining his flashlight to illuminate the interior of . . . [the defendant's] car trenched upon no right secured by the Fourth Amendment. The Court said in *United States v. Lee*, 274 U.S. 559, 563 [47 S.Ct. 746, 748] (1927): "[The] use of a searchlight is comparable to the use of a marine glass or a field glass. It is not prohibited by the Constitution." Numerous other courts have agreed that the use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection.

*Id.* at 739-40, 103 S.Ct. at 1542; *see also United States v. Dunn*, 480 U.S. 294, 305, 107 S.Ct. 1134, 1140 (1987); *United States v. Garner*, 907 F.2d 60, 62 n.2 (8th Cir.1990); *United States v. Baker*, 754 F.Supp. 445, 447 (E.D.Pa.1991) ("A visual inspection by a law enforcement officer from a vantage point where the officer had a right to be does not constitute a search for the purposes of the Fourth Amendment, even when aided by means such as a flashlight.").

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the MOTION TO SUPPRESS EVIDENCE filed December 12, 2006 (Doc. #22) by Brent O. Trower.

Counsel are reminded that each has 10 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                */s/ John T. Maughmer*
                **John T. Maughmer**
            **United States Magistrate Judge**